UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

─────────────────────────────

PRENTICE WHEATLEY,                               Civil No. 12-880 (DWF/AJB)

        Plaintiff,

   v.                                              **REPORT AND RECOMMENDATION**

MICHELLE SMITH, STEVE HAMMER,
DAVID REISHUS, SCOTT SCHANTZEN,
STEVE McCARTY, MIKE McMAHON,
Sgt. ADAM MURPHY, VUTHY LONG,
DAVID PAULSON, NANETTE LARSON,
and KATHY REID,

        Defendants.

─────────────────────────────

     Prentice Wheatley, Minnesota Correctional Facility - Oak Park Heights, 5329 Osgood Avenue North, Stillwater, Minnesota, 55082, Plaintiff, pro se.

     Jackson Evans, Assistant Minnesota Attorney General, 445 Minnesota Street, Suite 900, St. Paul, Minnesota, 55101, for Defendants.

─────────────────────────────────────────

ARTHUR J. BOYLAN, Chief Magistrate Judge

     The above-named Plaintiff, Prentice Wheatley, is a Minnesota state prison inmate.

He commenced this action by filing a complaint seeking relief under 42 U.S.C. § 1983 for

alleged violations of his federal constitutional rights.  The above-named Defendants have

filed a motion for summary judgment, seeking to have this action dismissed pursuant to

Fed. R. Civ. P. 56.[1]  The motion has been fully briefed by the parties, and the matter has

been referred to this Court for a Report and Recommendation ("R&R") under 28 U.S.C. §

───────────────

    [1]  Plaintiff's claims against two other Defendants, Stephen Craane and Keith Krueger, have already been dismissed on summary judgment.  (See Order dated September 16, 2013, [Docket No. 196].)

636 and Local Rule 72.1. In the present R&R, the Court will recommend that summary judgment be granted in favor of Defendants Michelle Smith, Steve Hammer, David Reishus, Scott Schantzen, Steve McCarty, Mike McMahon, Adam Murphy and Vuthy Long.[2]

## I. BACKGROUND

Plaintiff is serving a 125-month prison sentence that was imposed after he was found guilty of first degree assault, for beating his teenage daughter with a belt and an electrical cord. See Wheatley v. State, Nos. A10-1669, A10-2234 (Minn.App. 2011), 2011 WL 2437460 (unpublished opinion), rev. denied, Sept. 20, 2011. In July 2010, Plaintiff was transferred from the Minnesota Correctional Facility in Faribault, to the Minnesota Correctional Facility in Stillwater, ("MCF-STW"). (Affidavit of Prentice Wheatley, [Docket No. 171], [hereafter "Wheatley Aff."], p. 1, ¶ 1.) When Plaintiff arrived at MCF-STW, he was assigned to a section of the prison referred to as "B-West" or "B-W." That section of the prison houses about 286 inmates on four levels. (Affidavit of Scott Schantzen, [Docket No. 165], [hereafter "Schantzen Aff."], p. 1, ¶ 2.) The main level of B-W is called "the flag," and the upper three levels are referred to as "tiers." Each tier has two contiguous rows of cells that are called "galleys." (Id., p. ¶ 2.) There are 32 cells per galley, (id.) so presumably there are about 256 cells altogether in B-W.

After Plaintiff arrived in B-W, other inmates told him that there had been a "race riot" in the unit at some time in the past. (Wheatley Aff., p. 2, ¶ 4.) Plaintiff heard from other inmates that prison officials had placed the unit on "lockdown," and they had been trying

---

[2] In a separate R&R filed contemporaneously with the present R&R, the Court recommends that summary judgment be granted in favor of three other Defendants – David Paulson, Nanette Larson and Kathy Reid.

to resolve disputes between the inmates "discreetly."  (Id., ¶s 5-6.)  Prison officials appointed certain prisoners in B-W to be "unit representatives," (or "unit reps"), and those prisoners were supposed to serve as liaisons between the prison staff and the inmates. According to Plaintiff, different unit reps represented different prison gangs, and the prison staff expected the unit reps to help them minimize violent gang activities in B-W.  (Id., p. 3, ¶ 7; p. 6, ¶ 17, p 7, ¶ 24.)  After the riot, Plaintiff avers, unit reps were given special privileges, which included opportunities to "go anywhere in the unit," and gain access to other inmates' cells.  (Id. pp. 3-4, ¶s 8-11.)

There are two ways to unlock a cell door on B-W.  A cell door can be opened manually by a correctional officer, or it can be opened remotely by a correctional officer known as a "control panel operator," who works in a small enclosed booth, sometimes referred to as the "control bubble."  Most often, cell doors are opened remotely by the control panel operator.  (Schantzen Aff., ¶ 13.)  Once a cell door has been opened, the inmate-occupant can close the door either part way, or completely.  If the cell door is closed completely, it is relocked, and can only be opened by a correctional officer – either manually or remotely.

The cells at MCF-STW are quite old, and the remote door opening process does not always work smoothly.  (Schantzen Aff., ¶ 15.)  Sometimes an inmate will ask the control panel operator to open a cell door, either because the door did not open properly when the control panel operator tried to unlock it remotely, or because an inmate has accidently locked himself out of his cell.   An inmate is not supposed to ask the control panel operator to open the door of another inmate's cell.  (Id., ¶ 16.)  According to Plaintiff, however, unit reps in B-W occasionally asked the control panel operator to open the door of another

3

inmate's cell, for a variety of reasons, and such requests were often granted.  (Wheatley Aff., p. 4, ¶s 10-11, 13, 16.)   As explained by Plaintiff, "Sometimes the unit representative[']s request would be genuine, and often times not."  (Id., ¶ 10.)

In December 2010, Plaintiff was transferred to a different part of MCF-STW, but he returned to B-W in May 2011.  (Id., p. 10, ¶ 33, p. 12, ¶ 41.)  In June 2011, an inmate named Leonardo Wells, (also known as "Nardo"), moved into B-W.  (Id., pp. 12-13, ¶s 41-42.)  Wells was a member of a gang called the "Black Peace Stones."  (Id.)  During the summer of 2011, Wells was a unit rep in B-W.  Another member of the Black Peace Stones, Dwight Ford, (also known as "LB"), was a "unit worker" in B-W.  (Id., p. 14, ¶ 46.)  Wells and Ford were leaders of the Black Peace Stones gang.  (Wheatley Aff., Exhibit C, [Docket No. 172-1], Deposition of Prentice Wheatley, [hereafter "Wheatley Depo."], p. 32.)  Plaintiff had been a leader of the Black Peace Stones in the past, and he was still affiliated with the gang while he was in prison, although he considered himself to be "inactive."  (Wheatley Aff.,  p. 4, ¶ 12.)  Prior to August 11, 2011, Plaintiff did not have any problems with the Black Peace Stones.  (Wheatley Depo., pp. 30, 41.)  In fact, he "didn't have any problems with anyone," he "wasn't threatened," and he did not have "any issues" with anyone, including Wells and Ford.  (Id., p. 41; see also id., p. 28.)  Plaintiff had never been "messed with in prison," and he believed he was not in any danger, and everything was "fine."  (Id., pp. 7, 29-30.)

At about 7:00 a.m. on August 11, 2011, Plaintiff heard his cell door being remotely opened so he could get his breakfast.  (Wheatley Aff., p. 14, ¶ 47.)  He did not go to breakfast, but he did get up to close the door of his cell.  (Id.)  An hour later, Plaintiff's cell door was opened again, this time for a recreation period, and Plaintiff again got up, closed

the door, and went back to bed.  (Id., ¶ 48.)  Sometime thereafter, Plaintiff awoke and found that three other inmates had entered his cell.  Those three inmates assaulted Plaintiff, repeatedly kicking and punching him for several minutes.  (Id., p. 15, ¶s 49-50.)  The attackers hit Plaintiff in the head with a typewriter and a television set, and broke two or three of his teeth.  (Id., ¶ 50.)  After several minutes, the attackers fled from Plaintiff's cell, leaving him bleeding and dazed.  (Id.)

Plaintiff was removed from his cell after the assault, and he was transferred to a segregation unit.  He received medical attention for his injuries, and x-rays were taken, which revealed a "broken nose" and "eye fractures."  (Id., p. 16, ¶ 53.)  Plaintiff's cell was searched after the assault, and some alcohol was discovered.  He was not disciplined for his involvement in the altercation that occurred in his cell, but he was given 20 days of disciplinary segregation, because of the alcohol that was found in his cell.  (Id., ¶ 54.)

The three inmates who assaulted Plaintiff on August 11, 2011, were caught as they ran from his cell.  Their names are Jones, Harris and Cosey.  The day after Plaintiff was assaulted by Jones, Harris and Cosey, he was interviewed by Defendants Steve McCarty and Mike McMahon, who were working in the "Office of Special Investigations," ("OSI"), at MCF-STW.  (Wheatley Aff., p. 17, ¶55.)  Plaintiff told McCarty that he did not know the inmates who had assaulted him, and he did not know whether they belonged to any gang.  (Affidavit of Steven McCarty, [Docket No. 164], [hereafter "McCarty Aff."], p. 3, ¶ 5.[3])  Plaintiff said he was not having any problems with anyone in B-W, and he did not express any fear for his safety in B-W.  (Id.)  Plaintiff believed that the three inmates who assaulted

---

[3]  An audio recording of the interview is included in the record.  (McCarty Aff., Exh. D.)

him had just recently arrived at MCF-STW, ("they were brand new"), and he had never had any previous problems with any of them.  (Wheatley Depo., pp. 43-44.)  He did not know why Jones, Harris and Cosey had come to cell.  (Id., p. 14.)  Later, however, Plaintiff came to believe that they were Black Peace Stones, who had been "manipulated into assaulting" him.  (Id., p. 44.)  Jones, Harris, and Cosey were subsequently charged and convicted for third degree assault, and their prison sentences were extended as a result of their attack on Plaintiff.  (McCarty Aff., p. 2, ¶ 3.)

On August 14, 2011, Plaintiff was transferred back to B-W to complete his 20-day term of disciplinary segregation resulting from the alcohol found in his cell.  According to Defendant Scott Schantzen, a correctional officer who was then working in B-W:

> "Offenders can serve time on disciplinary segregation status in either a general living unit (called in house segregation) or the segregation unit. Offenders who serve time on disciplinary segregation status in a general living unit have reduced privileges, such as reduced recreation time, flag time, and canteen opportunities....  The segregation unit at MCF-STW has limited space and is often at capacity.  It is standard practice to have offenders who commit non-violent violations serve their disciplinary segregation on in house segregation."

(Schantzen Aff., p. 9, ¶ 23.)  Plaintiff had previously told McCarty that he was not having any problems with any other inmates in B-W, (following the removal of Jones, Harris, and Cosey), and he did not express any concerns about returning to that unit.  (McCarty Aff., p. 3, ¶ 5.)  Nothing in the record suggests that Plaintiff, or any correctional official, believed it might be unsafe for Plaintiff to return to B-W.

However, not long after Plaintiff returned to B-W on August 14, 2011, he was given a written message by a fellow inmate.  The gist of the message was "they want us to fight you," but "we don't want to do it."  (Wheatley Depo., p. 33.)  The message came from two

inmates named Hicks and Hayes.  Plaintiff believed those two inmates were being intimidated by Wells and Ford, the leaders of the Black Peace Stones gang.  (Id., pp. 33-34.)  Plaintiff sent a verbal message back to Hicks and Hayes, telling them to "stay out of it."  (Id., p. 33; see also Wheatley Aff., p. 19, ¶ 63.)  At some point thereafter, Wells and Ford came to Plaintiff's cell and told him "'we want you out [of] the building.'" (Wheatley Depo., p. 35.)  It was only then that Plaintiff first realized, (in his words, "at that time, now I knew"), that he had a problem with someone in B-W – namely Wells and Ford.  (Id.; see also id, p. 38-39.)

Plaintiff did not tell any correctional officers about his newly-discovered problems with Wells and Ford.  (Id., pp. 36, 39.)  He later left his cell, believing that Hicks and Hayes might heed his message to "stay out of it," and not try to fight with him.  (Id., pp. 37-38.)  However, while Plaintiff was outside of his cell, an inmate approached the control panel operator, Defendant Vuthy Long, and reported that Hicks and Hayes needed to be let out of their cell because the toilet in the cell was overflowing.  Long contacted another correctional officer named Jessica Serowiecki, and she confirmed that Long should remotely unlock the cell.  (Wheatley Aff., Exh. P, p. 1.)  After Long remotely opened the cell, he observed that Hicks and Hayes were approaching Plaintiff, and the three inmates appeared to be preparing to fight.  (Id.)[4]  Long summoned other correctional officers, who rushed to the site of the skirmish.  (Id.)  Serowiecki attempted to pull Plaintiff off of Hicks,

---

[4] Long's observation is confirmed by a video recording submitted by Defendants, which shows two inmates (presumably Hicks and Hayes), instigating a fight with a third inmate, (presumably Plaintiff).  (Schantzen Aff., Exh. E.)  Plaintiff's own description of the altercation, (Wheatley Aff., p. 20, ¶s 65-67), is generally consistent with the activity that can be seen on the video recording.

but Plaintiff continued to throw punches.  (Id., p. 2.)  Serowiecki later reported that one or more of Plaintiff's punches hit her in the face, causing her a bloody mouth, loose teeth, and a broken nose.  (Id.)  She also reported that she suffered a contusion on her arm, and a knee injury, while trying to subdue Plaintiff.  (Id.)

Immediately after the fight was over, Plaintiff expressed remorse over Serowiecki's injuries.  (Wheatley Aff., p. 20, ¶ 67.)  He respected Serowiecki, and he felt that he bore some responsibility for her injuries, but he does not believe that he was the person who hit her.  (Id.)  Nevertheless, disciplinary charges were brought against Plaintiff, and he was found guilty of violating of assaulting Hicks, Hayes and Serowiecki.  (Id., p. 21, ¶ 69.)  The resulting disciplinary sanctions included 540 days of segregated confinement, and 270 days of extended incarceration.  (Id.)  State criminal charges also were filed against Plaintiff, but those charges were later dismissed.  (Id., p. 21, ¶ 68.)

Plaintiff claims that after his fight with Hicks and Hayes, he "began experiencing excruciating head and facial pain."  (Id., p. 22, ¶ 71.)  Plaintiff believes the pain was caused by blows to his face and head during that fight, "on top of injuries already sustained" during the previous assault by Jones, Harris and Cosey.  (Id.)

On August 15, 2011, (one day after the second fight), McCarty interviewed Plaintiff for a second time.  During that interview, Plaintiff told McCarty, for the first time, that he was having problems with the Black Peace Stones.  (McCarty, Aff., p. 4, ¶ 10.)  Plaintiff also told McCarty, for the first time, who he suspected was ultimately responsible for the assaults that occurred on August 11th and August 14th, namely Wells and Ford.  (Id.)  According to McCarty, Plaintiff said that he thought Wells and Ford were able to get Jones, Harris and Cosey into his cell, so they could carry out the first assault, "by fooling" the control panel

operator.  (Id.)  The control panel operator at that time was Defendant Adam Murphy. (Wheatley Aff., Exh. F, p. 11.)

Within a few weeks after Plaintiff's altercation with Hicks and Hayes, he was transferred from MCF-STW to the Minnesota Correctional Facility at Oak Park Heights. (Wheatley Aff., p. 22. ¶ 74.)  He remains confined there at this time.

## II.  PLAINTIFF'S CLAIMS

Plaintiff claims that eight correctional officials at MCF-STW violated his constitutional rights under the Eighth Amendment, by failing to protect him from the inmates who were involved in the altercations in B-W on August 11th and August 14th of 2011.  Four of these correctional officials – Michelle Smith, Steve Hammer, David Reishus, and Scott Schantzen – are prison administrators, (referred to collectively as the "Administrative Defendants"). Two of the Defendants were the control panel operators in B-W on the days of the altercations – Adam Murphy, the control panel operator on August 11th, and Vuthy Long, the control panel operator on August 14th.  The other two Defendants being sued for failing to protect Plaintiff are Steve McCarty and Mike McMahon – the two correctional officials who investigated the altercations.  Plaintiff claims that these eight Defendants violated his federal constitutional rights under the Eighth Amendment, because they failed to protect him from other inmates residing in B-W.

Plaintiff contends that the four Administrative Defendants promulgated policies and practices that gave control panel operators in B-W the discretionary authority to remotely unlock an inmate's cell at the request of another inmate.  He further contends that the control panel operators, Murphy and Long, violated the Eighth Amendment by abusing their authority to remotely unlock inmates' cells.  Murphy is being sued for allegedly unlocking

Plaintiff's cell on August 11, 2011, and Long is being sued for letting Hicks and Hayes out of their cell on August 14, 2011.

Plaintiff's claims against the investigators, McCarty and McMahon, are more obscure.  It appears that Plaintiff is <u>not</u> suing those two Defendants for the injuries he sustained during the August 11th incident; but rather, he is suing them only for the August 14th incident.  Plaintiff appears to be claiming that McCarty and McMahon violated the Eighth Amendment by causing him to be returned to B-W just a few days after the earlier incident.

Defendants are seeking to have Plaintiff's Eighth Amendment claims dismissed on summary judgment.  The Court finds that Defendants are entitled to summary judgment, for the reasons discussed below.

## III.  STANDARD OF REVIEW

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is appropriate if the materials submitted in support of the motion "show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The standards for considering a motion for summary judgment are prescribed by Rule 56 of the Federal Rules of Civil Procedure, as interpreted in a trilogy of cases decided by the Supreme Court in 1986.  In one of those cases, <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 327 (1986), the Supreme Court described the importance of the summary judgment procedure:

> "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of  the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.' . . . Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that

are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis."

On a motion for summary judgment, the moving party has the initial burden of establishing the "material facts" and demonstrating that there is not a "genuine" dispute as to whether those material facts are true. Fed. R. Civ. P. 56(c). To defeat the motion, the opposing party must then establish that there is a "genuine" issue as to material facts.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Fed. R. Civ. P. 56(e). If a motion for summary judgment is properly supported by affidavits or other evidence, the nonmoving party must set forth specific facts, by affidavits or otherwise, showing that there is a genuine issue for trial. Id. at 587; Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc., 824 F.2d 582, 585 (8th Cir. 1987), cert. denied, 484 U.S. 1010 (1988). Although the evidence is examined in the light most favorable to the non-moving party, the non-moving party may not rely on conclusory allegations or denials. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Lambert v. City of Dumas, 187 F.3d 931, 934-35 (8th Cir. 1999).

The moving party is entitled to summary judgment when the non-movant fails to establish the existence of an essential element of a claim on which that party has the burden of proof at trial. Celotex Corp., 477 U.S. at 322. No genuine issue of material fact exists absent such foundation because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id.

11

at 323.

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co., 475 U.S. at 587.   The Court considers the motion for summary judgment based upon the material presented in connection with the motion.   "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson, 477 U.S. at 250.

The Court's inquiry should be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52. "A properly supported motion for summary judgment is not defeated by self-serving affidavits." Frevert v. Ford Motor Co., 614 F.3d 466, 473 (8th Cir. 2010) (quoting Bacon v. Hennepin Cnty Med. Ctr., 550 F.3d 711,716 (8th Cir. 2008)).   "Rather, the plaintiff must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor." Id. at 473-74.

The movant is entitled to summary judgment where the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322.   No genuine issue of fact exists in such a case because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

The Court is mindful that pro se pleadings should be liberally construed.  Haines v.

Kerner, 404 U.S. 519, 520 (1972); White v. Bond, 720 F.2d 1002, 1003 (8th Cir. 1983).

Therefore, pro se pleadings are held to less stringent standards when challenged by

motions to dismiss or for summary judgment.  Haines, 404 U.S. at 520; Horsey v. Asher,

741 F.2d 209, 211 n.3 (8th Cir. 1984).  Nevertheless, even a pro se party who opposes

summary judgment "is not permitted to merely rest on his pleadings but must instead set

forth sufficient evidence from which a reasonable jury could find in his favor on all elements

of his claims."  Johnson v. Hamilton, 452 F.3d 967, 972 (8th Cir. 2006).

## IV.  DISCUSSION

> "In Farmer v. Brennan, 511 U.S. 825... (1994), the Supreme Court
> confirmed that a prison official violates the Eighth Amendment if he is
> deliberately indifferent to the need to protect an inmate from a substantial risk
> of serious harm from other inmates.  The Court then undertook to define
> more precisely the concept of deliberate indifference.  Because the Eighth
> Amendment bans cruel and unusual punishment, suits against prison officials
> must satisfy a subjective requirement, an inquiry into the prison official's state
> of mind.  The Court concluded that deliberate indifference in this context
> means actual intent that the inmate be harmed, or knowledge that harm will
> result, or reckless disregard of a known excessive risk to inmate health and
> safety."

Newman v. Holmes, 122 F.3d 650, 652 (8th Cir. 1997) (citations omitted).

The Eighth Circuit Court of Appeals has explained that –

> "[T]he eighth amendment's prohibition against cruel and unusual punishment
> requires prison officials to 'take reasonable measures to guarantee' inmate
> safety by protecting them from attacks by other prisoners, Farmer v.
> Brennan, 511 U.S. 825, 832... (1994)....  Of course, prison officials do not
> commit a constitutional violation every time one prisoner attacks another.
> See id. at 834...; Blades v. Schuetzle, 302 F.3d 801, 803-04 (8th Cir. 2002).
> In order to establish an eighth amendment failure-to-protect claim, a plaintiff
> must show that the prison official was deliberately indifferent to a 'substantial
> risk of serious harm.'  Farmer, 511 U.S. at 828...."

Young v. Selk, 508 F.3d 868, 871-72 (8th Cir. 2007).

> "To prove deliberate indifference, an inmate must make a two-part showing:

'The first requirement tests whether, viewed objectively, the deprivation of rights was sufficiently serious. The second requirement is subjective and requires that the inmate prove that the prison officials had a 'sufficiently culpable state of mind.'' Irving v. Dormire, 519 F.3d 441, 446 (8th Cir.2008) (quoting Farmer, 511 U.S. at 834).... The deprivation is ''objectively, sufficiently serious,' [under the first requirement when] the official's failure to protect resulted in the inmate being 'incarcerated under conditions posing a substantial risk of serious harm.'' Young, 508 F.3d at 872 (quoting Farmer, 511 U.S. at 834...). 'An official is deliberately indifferent [under the second requirement] if he or she actually knows of the substantial risk and fails to respond reasonably to it.' Id. at 873 (citing Farmer, 511 U.S. at 844-45).''

Nelson v. Shuffman, 603 F.3d 439, 446 (8th Cir. 2010) (emphasis added).

Thus, to successfully prosecute an Eighth Amendment failure-to-protect claim, a prisoner-plaintiff must prove that (1) he was '''incarcerated under conditions imposing a substantial risk of serious harm,''' (Jensen v. Clarke, 94 F.3d 1191, 1197 (8th Cir. 1996), quoting Farmer, 511 U.S. at 834), and (2) the defendants who are being sued were aware of the risk of serious harm and deliberately ignored it. Jackson v. Everett, 140 F.3d 1149, 1151 (8th Cir. 1998). This requires a court to address two questions: (1) Was the plaintiff exposed to a substantial risk of serious harm as a result of some particular condition or circumstances in the prison? (2) Did the defendant actually recognize that risk and ignore it? See Williams v. Nebraska State Penitentiary, 57 F.3d 667, 669 (8th Cir. 1995) ("to be liable, the accused prison official must have remained deliberately indifferent to an actually known risk of harm to the prisoner"); Spruce v. Sargent, 149 F.3d 783, 785 (8th Cir. 1998) ("[d]eliberate indifference requires a showing that the official knew the risk existed, but disregarded it").

A.  The Administrative Defendants

Plaintiff contends that the four Administrative Defendants, (Smith, Hammer, Reishus, and Schantzen), violated his Eighth Amendment rights by implementing a policy or practice

14

that allowed the control panel operators in B-W to remotely open the door of an inmate's cell at the request of another inmate.  That policy or practice allegedly created a substantial risk of serious harm to Plaintiff, because it authorized Defendant Murphy to unlock Plaintiff's cell at the request of some other inmate, which in turn gave Jones, Harris and Cosey an opportunity to assault Plaintiff.  (See Plaintiff's Memorandum in Opposition to Summary Judgment, [Docket No. 170], [hereafter "Pl.Memo."], pp. 5-8.)

According to Plaintiff, the purpose of this alleged policy or practice was to give unit reps a better opportunity to communicate with other inmates, and thereby "defuse the violence in B-West."  (Id., p. 7.[5])  As explained by another inmate who resided in B-W, Anthony Wilkes, "Unit representatives, they got them to try to, you know, calm B-West down, you know what I'm saying, stop all the problems and stuff."  (Wheatley Aff., Exhibit E, [Docket No. 172-1], Deposition of Anthony Wilkes, [hereafter "Wilkes Depo."], p. 23.)  If there was an argument involving gang members, a unit rep might ask the control panel operator to open another inmate's cell "so we can have a meeting and talk things over so things won't escalate."  (Id., p. 59.  See also David Reishus's Answers to Interrogatories, Wheatley Aff., Exhibit O, [Docket No. 172-2], p. 5, Answer to Question No. 7, ["the idea

---

[5]  In Plaintiff's affidavit, he states that:

"Occasionally, Unit Representatives would tell staff to open my cell stating simply that they needed me out to talk to somebody about an issue.  Without asking me any questions or even approaching my cell, staff would comply by opening my cell.  No other inmate had that power with staff.  Sometimes the Unit Representative[']s request would be genuine and often times not.  All staff needed to know was that it was a Unit Representative making the request, to comply."

(Wheatley Aff., p. 4, ¶ 10.)

behind the Unit Representative is to have a good two way communication tool... so that the concerns of both sides could be effectively addressed"].)

Plaintiff does not question the motives of the Administrative Defendants, but he alleges that their plan "backfired." (Pl.Memo., p. 6.) To support his assertion that Defendants' alleged plan "backfired," Plaintiff avers that –

> "I personally observed many of the Unit Representatives having staff open one inmate[']s cell, ordering that inmate to 'violate' (one inmate beating up another for violating the groups/gangs rules) another inmate, then having staff open the victim[']s cell for the violation. Because the Unit Representative was 'dealing with' his gang[']s 'business,' the staff would ignore these actions to keep it discreet. These instances to my knowledge <u>always went unreported</u>; even after staff would observe bruises on the victim...."

(Wheatley Aff., p. 4, ¶ 11, [emphasis added].)

Viewing the evidence of record most favorably to Plaintiff, the Court finds that the Administrative Defendants (or at least some of them) might have known that unit reps in B-W could ask the control panel operator to grant them access to another inmate's cell.[6] However, there is no evidence showing, or even suggesting, that any of the four Administrative Defendants actually knew that unit reps, (or any other inmates), could readily gain access to another inmate's cell in order to assault that inmate. As Plaintiff himself has candidly acknowledged, any assaults that may have been committed in that manner

---

[6] It should be emphasized that Defendants expressly deny that any inmate, including a unit rep, can gain unsupervised access to another inmate's cell, merely by asking the control panel operator to unlock the cell. (<u>See</u> Schantzen Aff., p. 7, ¶ 16.) Defendants acknowledge that inmates frequently ask the control panel operator to unlock cell doors for a variety of legitimate reasons – e.g., if a door failed to unlock when it should have, or if an inmate has accidently locked himself out of his cell. (<u>See</u> <u>id</u>., ¶ 15.) However, they aver that no inmate's cell will ever be remotely unlocked based solely on an unverified request of another inmate. (<u>See</u> <u>id</u>., ¶ 16.)

"always went unreported." (Id.)  Viewing this evidence most favorably to Plaintiff, the record indicates that if any of the Administrative Defendants actually did know that unit reps, (or other inmates), could gain access to another inmate's cell, they would have expected such access to be allowed only to "defuse" potential violence, not to inflict it.[7]

The Eighth Circuit Court of Appeals has frequently held that an Eighth Amendment failure-to-protect claim is sustainable only if the defendant actually knew about, but deliberately ignored, a substantial risk of serious harm to a prisoner-plaintiff. Nelson, 603 F.3d at 446; Williams, 57 F.3d at 669.  In this case, Plaintiff has not shown that the Administrative Defendants possessed the requisite knowledge of the substantial risk of serious harm that allegedly existed on B-W – i.e., the alleged risk that a unit rep could easily gain access to another inmate's locked cell so that he could be assaulted.  There is no evidence showing that any of the four Administrative Defendants actually knew that inmates in B-W faced a substantial risk of serious harm because (at least according to Plaintiff) control panel operators regularly unlocked inmates' cells so that unit reps or other inmates could carry out assaults.  Therefore, the Court finds, as a matter of law, that Plaintiff's failure-to-protect claim against the Administrative Defendants is not sustainable, and those Defendants are entitled to summary judgment.

_____

[7] The Court makes no finding, one way or the other, as to whether there actually was any policy or practice at MCF-STW that would have allowed a unit rep to gain access into the locked cell of another inmate.  The wisdom of any such policy or practice, even to advance the benign objective of defusing potential violence, seems somewhat dubious. However, the Court is mindful of the admonition that "we give prison officials 'wide-ranging deference ... to preserve internal order and discipline and to maintain institutional security.'" Jackson, 140 F.3d at 1152-53, quoting Falls v. Nesbitt, 966 F.2d 375, 379 (8th Cir.1992). Here, the Court finds only that, based on Plaintiff's evidence, it appears that unit reps might have been allowed to gain access to another inmate's cell for what staff would have perceived to be a benign objective – e.g., to help reduce conflicts between inmates.

Plaintiff may believe that the Administrative Defendants <u>should have</u> recognized the risk of assault that allegedly existed on B-W, but even if that notion were sustainable, it would not defeat summary judgment. "[A]n official's failure to alleviate a significant risk that he <u>should have perceived but did not</u>, while no cause for condemnation, cannot... be condemned as the infliction of punishment." <u>Farmer</u>, 511 U.S. at 838 (emphasis added). <u>See</u> <u>also</u> <u>Jensen</u>, 73 F.3d at 811 (<u>Farmer</u>... specifically rejects the idea that liability may be found when a risk is so 'obvious that it should [have been] known'"), quoting <u>Farmer</u>, 511 U.S. at 836. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, <u>and he must also draw the inference</u>." <u>Farmer</u>, 511 U.S. at 837 (emphasis added). Plaintiff has not presented evidence that would allow a trier of fact to conclude that any of the four Administrative Defendants actually did know, (or actually did "draw the inference"), that Plaintiff was exposed to a substantial risk of serious harm while he was residing on B-W. More specifically, Plaintiff has not shown that the Administrative Defendants implemented policies or practices which <u>they knew</u> were allowing some inmates to carry out assaults on other inmates.

B. <u>The Control Panel Operators</u>

Plaintiff also claims that his Eighth Amendment rights were violated by two of the control panel operators who were working in B-W in August 2011. He claims that Defendant Adam Murphy wrongly allowed inmates Jones, Harris and Cosey to enter his locked cell on August 11, 2011, and Defendant Vuthy Long wrongly released inmates Hicks and Hayes from their cell on August 14, 2011. Neither of those Eighth Amendment claims can survive summary judgment.

**(i) Defendant Murphy**

18

Plaintiff alleges that during the morning of August 11, 2011, two leaders of the Black Peace Stones gang, (presumably Wells and Ford), met with inmates Jones, Harris and Cosey.  The gang leaders allegedly instructed the other three inmates, who apparently were members of their gang, to attack Plaintiff.  One of the gang leaders allegedly approached Defendant Murphy, the control panel operator, and asked him to remotely unlock Plaintiff's cell.  One of the gang leaders then allegedly gave a signal directing Jones, Harris and Cosey to go to Plaintiff's cell and carry out the pre-planned assault.  Murphy allegedly unlocked Plaintiff's cell as requested, and Jones, Harris and Cosey then entered Plaintiff's cell and assaulted him.  (See Pl.Memo., pp. 26-29.)  Plaintiff has no first-hand knowledge of any of these events, because he was sleeping at the time.  Plaintiff's description of these events is based primarily on statements made by fellow inmate Anthony Wilkes.  (See Affidavit of Anthony Wilkes, Plaintiff's Exhibit E, [Docket No. 172-1],[hereafter "Wilkes Aff."], pp. 1-2, ¶s 1-6.)

Defendant Murphy flatly denies that he remotely unlocked Plaintiff's cell door at the request of a Black Peace Stones gang leader.  (Adam Murphy's Answers to Written Deposition Questions,  Wheatley Aff., Exhibit G, [Docket No. 172-1], p. 23, Answer to Question No. 188.)  Murphy says that Plaintiff's cell had been properly unlocked on the morning of August 11, 2011, so Plaintiff could leave for recreation or "flag time," and he seems to believe that Plaintiff simply left it unlocked.  (See id., Answers to Questions Nos. 189-195.)  However, Murphy's statements are contradicted by Wilkes's statements, and that contradiction cannot be resolved on summary judgment.  For present purposes, the Court accepts Plaintiff's evidence (namely the Wilkes affidavit) indicating that Murphy unlocked Plaintiff's cell at the request of one of the leaders of the Black Peace Stones.

19

It does not follow, however, that Plaintiff's Eighth Amendment claim against Murphy should survive summary judgment.  Even if Murphy did unlock Plaintiff's cell at the request of a gang leader, there is no evidence suggesting that Murphy knew he was thereby exposing Plaintiff to a substantial risk of serious harm.  The record clearly shows that as of August 11, 2011, Plaintiff himself had no fear of any members of the Black Peace Stones, or anyone else.  At that time, Plaintiff had not been in any fights with anyone, he did not have any problems with anyone, and he did not believe that anyone posed a threat to his safety and well-being.  (Wheatley Depo., pp. 39-41.)   Plaintiff has offered no evidence suggesting Defendant Murphy knew about any threat to Plaintiff's safety that was unknown to Plaintiff himself.

It is important to recognize that Murphy did not unlock Plaintiff's cell at the request any member of a <u>rival</u> gang.  The gang leaders who (allegedly) asked Murphy to unlock Plaintiff's cell belonged to the Black Peace Stones – the gang with which Plaintiff was (or had been) affiliated.  Therefore, it is not particularly surprising that Plaintiff felt no prior fear of the inmates who assaulted him, or the inmates who allegedly sought to have his cell unlocked, (Wells and Ford).  And again, if Plaintiff did not view those inmates as a threat to his safety, the Court finds no reason to believe that Murphy should have done so.[8]

---

[8]   The facts of this case are very different from those presented in <u>Mayoral v. Sheahan</u>, 245 F.3d 934 (7th Cir. 2001) – a Seventh Circuit decision that has been cited by Plaintiff.  (Pl.Memo., pp. 9-11.)  In <u>Mayoral</u>, the plaintiff was a gang member who was accused of murdering a member of a rival gang.  The plaintiff was placed in a jail unit that was populated by members of the rival gang, and he vigorously and repeatedly told jail officials that he feared for his safety.  Despite the plaintiff's pleas, some jail officials allegedly left the plaintiff with the rival gang members, even after they got drunk and started a riot.  The plaintiff suffered serious injuries during the riot, and sued the jail officials who allegedly knew they were exposing him to a substantial risk of serious harm.  Given the plaintiff's express concerns about being housed with rival gang members, and the obviously

The evidence in the record indicates that prison officials sometimes allowed unit reps to confer with other inmates in order to defuse potentially violent situations. That may or may not explain how Jones, Harris and Cosey gained access to Plaintiff's cell on August 11, 2011. Perhaps Murphy mistakenly believed that the leaders of the Black Peace Stones wanted to confer with Plaintiff for some benign purpose; perhaps Murphy was somehow unwittingly "tricked" into unlocking Plaintiff's cell by some other means; perhaps Murphy was not paying close enough attention to his job; or perhaps Murphy did not unlock Plaintiff's cell at all, but rather, Plaintiff himself simply left it unlocked. The mystery of how Jones, Harris and Cosey gained access to Plaintiff's cell need not be fully resolved here. Regardless of how that happened, <u>there is no evidence showing that Defendant Murphy actually knew that unlocking Plaintiff's cell, (if Murphy really did that), would expose Plaintiff to a substantial risk of serious harm</u>. "[N]either unsupported conjecture nor negligence regarding a substantial risk of serious harm to the inmates is sufficient to prove deliberate indifference." <u>Lenz v. Wade</u>, 490 F.3d 991, 996 (8th Cir.), <u>cert</u>. <u>denied</u>, 552 U.S. 998 (2007).

The Court understands that in an Eighth Amendment failure-to-protect case, a defendant prison official can be held liable even if he does not explicitly admit that he knew the prisoner-plaintiff was exposed to a substantial risk of serious harm. The subjective requirement of actual knowledge can be established by circumstantial evidence, and not

---

volatile situation caused by the riot, the Court found that the plaintiff's claims against some of the jail officials could survive summary judgment. The present case is much different from <u>Mayoral</u>, because here Plaintiff never expressed any fear about being attacked by rival gang members, (or anyone else), and there is no evidence showing that Defendants <u>knew</u> that Plaintiff was exposed to an obviously dangerous situation.

just by an express "confession" from the defendant.  See Farmer, 511 U.S. at 842 ("[whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence").   However, the question of whether a factfinder can infer a defendant's knowledge is different from the question of whether the defendant himself actually did infer that the plaintiff was in danger.  To establish liability, the factfinder must conclude that the defendant himself actually did infer that the plaintiff was in danger.  See id. at 837 ("the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference") (emphasis added).  Here, there is no evidence – either direct or circumstantial – that would allow a factfinder to infer that Defendant Murphy actually did know, (or actually did draw the inference), that Plaintiff was being exposed to a substantial risk of serious harm when Murphy (allegedly) unlocked Plaintiff's cell on August 11, 2011.  Because there is no evidence showing that Murphy knowingly exposed Plaintiff to a substantial risk of serious harm, no judge or jury could render a verdict in Plaintiff's favor on his failure-to-protect claim against Murphy.  See Lenz, 490 F.3d at 996 (Eighth Amendment claim against warden was unsustainable where prisoner-plaintiff "never presented any direct or circumstantial evidence" showing that the warden knew subordinate correctional officers "posed substantial risks of serious harm to the inmates").  Therefore, Murphy is entitled to summary judgment.[9]

---

[9] Plaintiff also contends that Murphy should be liable because he did not promptly respond to the assault committed by Jones, Harris and Cosey.  (See Pl.Memo., pp. 38-42.) However, Murphy has averred that he did not leave the control panel booth and respond to the assault, because he was not the first to witness it.  By the time Murphy became

### (ii) Defendant Long

Plaintiff's Eighth Amendment claim against the other control panel operator, Defendant Vuthy Long, is also untenable.  Plaintiff is attempting to sue Long for letting Hicks and Hayes out of their cell on August 14, 2011.  However, Plaintiff has presented no evidence showing that Long violated his rights under the Eighth Amendment.

The evidence in the record shows that an inmate in the B-W unit told Long that Hicks and Hayes needed to be let out of their cell, because it was flooding.  Long checked with another correctional officer who apparently was closer to the cell, and that officer confirmed that Hicks and Hayes should be let out of their cell.  (Wheatley Aff., Exh. P, p. 1.)  After Hicks and Hayes were released from their cell, they approached Plaintiff, who also was outside of his cell, and a fight started.  Plaintiff claims that Long violated the federal Constitution by allowing Hicks and Hayes out of their cell, after Long learned and confirmed that their cell was flooded.

Plaintiff's claim against Long must be rejected, because he has presented no evidence showing that Long knew that releasing Hicks and Hayes from their cell created a substantial risk of serious harm to Plaintiff.[10]  Nothing in the present record suggests that

_____

aware of the assault, another correctional officer was already aware of it.  At that point, Murphy merely watched other officers responding to the incident, and he did not personally go to the scene, because control panel operators are prohibited from leaving the control panel booth.  (Adam Murphy's Answers to Written Deposition Questions,  Wheatley Aff., Exhibit G, [Docket No. 172-1], p. 3, Answer to Question No. 4; p. 24, Answers to Questions Nos. 198 and 199.)  Plaintiff has provided no evidence to the contrary.

[10]  It is questionable whether Hicks and Hayes actually presented a "serious risk of substantial harm" to Plaintiff.  The record shows that Hicks and Hayes did not really want to hurt Plaintiff, and they forewarned him that they had been instructed to attack him. Plaintiff was not afraid of Hicks and Hayes, and when they did come after him, he was prepared to defend himself.  The fight ended quickly, and it is unclear whether Plaintiff

Long had any reason to think that Hicks and Hayes wanted to get out of their cell for any nefarious purpose. Even if Long knew that Plaintiff had been assaulted a few days earlier, there is no evidence suggesting that Long knew someone might try to assault Plaintiff again. The inmates who had committed the earlier assault, (Jones, Harris and Cosey), had been removed from B-W, so there was no present reason to be concerned about them. There is simply no evidence at all that suggests Long knew Hicks and Hayes might try to assault Plaintiff when they were released from their cell. Therefore, Plaintiff's Eighth Amendment failure-to-protect claim against Long must be dismissed on summary judgment. See Smith v. Gray, Rucker & Harkins, 259 F.3d 933, 934 (8th Cir. 2001) ("District Court properly granted summary judgment to the defendants, because [the plaintiff's] evidence did not show that the officers knew that allowing the unrestrained inmate out of his cell presented a significant risk to [the plaintiff]").

C. The Investigators

The last two Defendants who are being sued for failing to protect Plaintiff are Defendants Steve McCarty and Mike McMahon – the two correctional officers who interviewed Plaintiff after each of the two altercations giving rise to the present lawsuit. Evidently, Plaintiff is not attempting to sue McCarty and McMahon for the injuries that he

---

suffered any new injuries. The incident that occurred on August 14, 2011, was very different from the incident that had occurred three days earlier. The first incident apparently was a vicious surprise attack by three inmates who assaulted Plaintiff inside of his own cell while he allegedly was asleep. The second incident involved an attack by two inmates who did not want to harm him, and forewarned him so that he could defend himself when they came after him in a communal section of B-W. For now, the Court will assume that the second incident involved a substantial risk of serious harm to Plaintiff that would satisfy the "objective" component of a failure-to-protect claim. That assumption, however, is extremely generous to Plaintiff.

sustained in the initial incident, when Jones, Harris and Cosey entered his cell.  (In any event, there certainly is no evidence suggesting that, prior to the first incident, either McCarty or McMahon had any reason to believe that anyone posed any substantial risk of serious harm to Plaintiff.)  It clearly appears that Plaintiff's failure-to-protect claim against McCarty and McMahon arises solely from the second incident, namely Plaintiff's fight with Hicks and Hayes on August 14, 2013.

Plaintiff claims that McCarty and McMahon were responsible for sending him back to B-W three days after his altercation with Jones, Harris and Cosey, and they should have recognized that doing so would put Plaintiff in danger.  To support this claim, Plaintiff postulates that McCarty and McMahon let it be known that Plaintiff wanted to press criminal charges against the inmates involved in the first altercation.  By doing so, McCarty and McMahon allegedly caused Plaintiff to be viewed as a "snitch" within B-W, thereby exposing Plaintiff to a substantial risk of serious harm.  (See Pl.Memo., pp. 46, 50-51.)  However, this failure-to-protect claim against McCarty and McMahon is flawed in several respects.

First, Plaintiff has not identified any evidence showing that McCarty and McMahon actually were responsible for returning him to B-W after the assault by Jones, Harris and Cosey.  Moreover, McCarty denies that allegation.  (See Steve McCarty's Answers to Written Deposition Questions,  Wheatley Aff., Exhibit L, [Docket No. 172-2], p. 31, Answer to Question No. 288.)   For this reason alone, Plaintiff's claims against McCarty and McMahon are fatally flawed.

Second, there is no evidence showing that McCarty and McMahon told anyone that Plaintiff wanted criminal charges brought against Jones, Harris and Cosey.  Plaintiff certainly has not cited any specific evidence showing that Wells, Ford, Hicks or Hayes –

or anyone else on B-W – knew that he wanted to pursue criminal charges against anyone. Simply put, there is no evidence that anyone thought Plaintiff was a "snitch."

Indeed, the evidence shows that the altercation that occurred on August 14, 2011, was wholly unrelated to Plaintiff's interview with McCarty and McMahon two days earlier. Instead, it clearly appears that the altercation resulted from some type of grudge or power struggle involving Wells and Ford, which arose well before Plaintiff's first interview with McCarty and McMahon.  Plaintiff contends that Hicks and Hayes were instructed to fight him, not because he had been labeled a "snitch," but because of a pre-existing (and previously unknown) problem that he had with Wells and Ford.  Based on Plaintiff's own explanation of what transpired, no trier of fact could find that Hicks and Hayes wanted to fight Plaintiff because McCarty and McMahon had caused him to be identified as a "snitch."

Plaintiff further contends that McCarty and McMahon knowingly exposed him to a substantial risk of serious harm, simply because they (allegedly) returned him to a section of the prison where other members of the Black Peace Stones were housed.  However, this argument assumes that McCarty and McMahon knew that the Black Peace Stones posed a threat to Plaintiff's safety, and there is no evidence to support that assumption.  When Plaintiff was interviewed after being assaulted on August 11, 2011, he did not tell McCarty and McMahon that the attackers were Black Peace Stones.  In fact, Plaintiff said he did not know the attackers, he did not know anything about their gang affiliation, (if any), and he did not know why the assault occurred.  (McCarty Aff., p. 3, ¶ 5.)  Plaintiff has cited no evidence suggesting that McCarty or McMahon had any reason to believe, as of August 14, 2011, that the assault that occurred on August 11, 2011, was gang related.

Moreover, Plaintiff's own statements clearly show that he himself did not know that

the first fight on August 11th was gang related, until just before the second fight occurred on August 14th. (Wheatley Depo., pp. 35, 38-39.) Plaintiff has candidly acknowledged that he did not think he had any problems with the Black Peace Stones prior to his return to B-W on August 14th, and he did not feel threatened by anyone affiliated with that gang when he first got back to B-W. It was only sometime <u>after</u> Plaintiff was back in B-W that he first realized he had a problem. (<u>Id</u>.) Plaintiff's own lack of concern about returning to B-W might not be conclusive, but it certainly bolsters McCarty's and McMahon's assertions that they had no concerns about Plaintiff's safety in B-W following the removal of Jones, Harris and Cosey. (<u>See</u> Steve McCarty's Answers to Written Deposition Questions, Wheatley Aff., Exhibit L, [Docket No. 172-2], p. 31, Answer to Question No. 281 ["Wheatley's safety did not appear to be in jeopardy after he was separated from Cosey, Harris and Jones"]; Mike McMahon's Answers to Interrogatories, Wheatley Aff., Exhibit N, [Docket No. 172-2], p. 6, Answer to Interrogatory No. 9 ["it was reasonable and safe to transfer Wheatley back to the B-West Living Unit since the assailants were no longer living in the B-West Living Unit"].)

In any event, Plaintiff is unable to show that McCarty or McMahon <u>actually knew</u> that he (Plaintiff) would be at risk upon his return to B-W on August 14th. There is no evidence that would allow a judge or jury to find that either of those two Defendants knew Plaintiff was having trouble with any member of the Black Peace Stones, or anyone else. The evidence shows that the risk to Plaintiff became known to him, and to Defendants, only <u>after</u> he returned to B-W on August 14th. Because Plaintiff is unable to show that either McCarty or McMahon exposed him to a <u>known</u> risk of serious harm, those two Defendants are entitled to summary judgment on Plaintiff's failure-to-protect claim.

27

## V.  CONCLUSION

The injuries that Plaintiff suffered as a result of the incidents described in this R&R are certainly regrettable, and it appears to the Court that Plaintiff did nothing to deserve those injuries.  However, "not... every injury suffered by one prisoner at the hands of another... translates into constitutional liability for prison officials responsible for the victim's safety."  Farmer, 511 U.S. at 834.  A prisoner cannot successfully prosecute an Eighth Amendment failure-to-protect claim against a prison official, unless he can prove that the prison official had a "'sufficiently culpable state of mind.'"  Id, quoting Wilson v. Seiter, 501 U.S. 294, 297 (1991).  In this case, the extensive evidentiary record shows that Plaintiff could not satisfy his burden of proof if this case were to proceed to trial.  No rational trier of fact could conclude that any of the eight Defendants now before the Court actually knew that Plaintiff was exposed to a substantial risk of serious harm before his injuries occurred. Therefore, Plaintiff's Eighth Amendment claims against those Defendants must be dismissed on summary judgment.[11]

## VI. RECOMMENDATION

Based on the foregoing, and all the files, records and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

---

[11]  Having determined that none of Plaintiff's § 1983 claims is sustainable, the Court will not specifically address Defendants' qualified immunity defenses.  See Holden v. Hirner, 663 F.3d 336, 343 (8th Cir. 2011) ("[b]ecause we conclude Holden failed to demonstrate the deprivation of a constitutional right, we do not discuss further the prison officials' claim of qualified immunity"); Schmidt v. City of Bella Villa, 557 F.3d 564, 574 (8th Cir. 2009) ("[s]ince we find no constitutional violation, we need not address the issue[ ] of qualified immunity"); Price v. Larkins, 499 Fed.Appx. 622, 623 (8th Cir. 2013) (unpublished opinion) ("[b]ecause we agree with the court that the record does not establish an Eighth Amendment violation, we need not address the issue of qualified immunity").

1.  Defendants' motion for summary judgment, (Docket No. 162), be **GRANTED** in favor of Defendants Michelle Smith, Steve Hammer, David Reishus, Scott Schantzen, Steve McCarty, Mike McMahon, Adam Murphy and Vuthy Long; and

2.  Plaintiff's claims against Defendants Michelle Smith, Steve Hammer, David Reishus, Scott Schantzen, Steve McCarty, Mike McMahon, Adam Murphy and Vuthy Long, be **DISMISSED WITH PREJUDICE**.

Dated: January 6, 2014

 s/Arthur J. Boylan
ARTHUR J. BOYLAN
Chief United States Magistrate Judge

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.  This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals.  Written objections must be filed with the Court before January 21, 2014..